**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

AMANDA THORN-FREEMAN,

      Plaintiff,

      vs.                                                                Civ. No. 20-448 JAP/GJF

JOSE R. VALDEZ, et al.,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

On May 18, 2020, Defendants Roberta Lucero-Ortega and New Mexico Department of Corrections filed a MOTION TO DISMISS COMPLAINT BASED IN PART ON QUALIFIED IMMUNITY ("Motion") (Doc. 3).[1]  Defendants move to dismiss Count II (Supervisory Liability under 42 U.S.C. § 1983) brought against Defendant Lucero-Ortega in her individual capacity and Count III (New Mexico Tort Claims Act) brought against both movants.  After careful consideration of the pertinent law and the parties' briefing, the Court will grant the Motion.

**I.     FACTUAL BACKGROUND[2]**

During the relevant period, Plaintiff was incarcerated at the Western New Mexico Correctional Facility ("WNMCF") in Grants, New Mexico.  COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND CLAIMS UNDER THE NEW MEXICO TORT CLAIMS ACT, ("Complaint") (Doc. 1, Ex. 1) at ¶ 1.  Defendant New Mexico Department of Corrections

---

[1] Defendant Jose Valdez is not a party to this Motion.

[2] The Court accepts as true the factual allegations in the Complaint for the purposes of deciding a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court does not, however, accept as true any legal conclusions within the Complaint. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

("NMDC") is the state agency that manages the WNMCF.  *Id.* at ¶ 4.  During Plaintiff's term of incarceration at the WNMCF, Defendant Valdez was a corrections officer and Defendant Lucero-Ortega was the warden.  *Id.* at ¶¶ 2–3.

In May 2018, Defendant Valdez caught Plaintiff cutting her leg.  *Id.* at ¶ 5.[3]  Plaintiff was transferred to WNMCF from a lower security facility due to "cutting" infractions.  *Id.* at ¶ 8. Because of this, Plaintiff feared that she would be disciplined, so she requested that Defendant Valdez not report the infraction.  *Id.* ¶ 8–9.  Defendant Valdez agreed but only if Plaintiff "kept him happy."  *Id.* at ¶ 10.

On or about May 27, 2018, Defendant Valdez entered Plaintiff's cell to confirm that Plaintiff "was going to keep him happy."  *Id.* at ¶ 11.  The next day, Defendant Valdez entered Plaintiff's cell twice.  *Id.* at ¶ 12–13.  During the first encounter, Defendant Valdez "grabbed his genitals over his pants" in front of Plaintiff and, during the second, forced Plaintiff's hand to touch his clothed genital area while he "brushed against her breasts."  *Id.*  On May 29, 2018, Defendant Valdez again entered Plaintiff's cell and digitally penetrated her vagina.  *Id.* at ¶ 14.  Later that day, Defendant Valdez "escorted [Plaintiff] to the broom closet where she had to get cleaning implements."  *Id.* at ¶ 15.  While in the broom closet, Defendant Valdez grabbed Plaintiff's hand, placed it on his clothed genitals, and touched her chest area.  *Id.*  On June 3, 2018, Defendant Valdez entered Plaintiff's cell for the last time and tried to kiss her but she resisted.  *Id.* at ¶ 17. During these encounters, Plaintiff believed that if she did not make "Defendant Valdez happy," she would be disciplined.  *Id.* at ¶ 16.  On each occasion, WNMCF video monitors captured Defendant Valdez entering Plaintiff's cell in violation of WNMCF policy.  *Id.* at ¶ 28.

---

[3] "Cutting" is a form of self-abuse that individuals employ to deal with emotional pain.  *Id.* at ¶ 6.

Plaintiff alleges that Defendant Lucero-Ortega exposed her to an unreasonable risk of sexual assault and acted with deliberate indifference by failing to "institute policies concerning screening, training, and monitoring of corrections officers so as to keep WNMCF prisoners reasonably safe from sexual assault by corrections officers and staff." *Id*. at ¶ 27.  According to Plaintiff, if corrections officers knew that they were being monitored, they would be less likely to commit sexual assault against inmates.  *Id*. at ¶ 29.  Plaintiff alleges that, because of the "lax screening, training, and monitoring of staff at WNMCF[,] there have been numerous recent accusations of sexual assault on inmates by corrections officers there, including other allegations against Defendant Valdez." *Id*. at ¶ 30.

Lastly, Plaintiff maintains that "Defendants had a duty to operate the WNMCF in a manner so as to avoid the risk of harm to the inmates of the facility."  *Id*. at ¶ 33.  Plaintiff argues that Defendants Lucero-Ortega and NMDC breached this duty by failing to implement policies and procedures designed to ensure that inmates were safe from sexual assault.  *Id*. at ¶ 35.  Plaintiff asserts that Defendant NMDC has waived immunity under N.M. Stat. Ann. § 41-4-6.  *Id*. at ¶ 38.  Alternatively, Plaintiff argues that Defendant NMDC "is responsible for the negligence of its employees under the doctrine of *respondeat superior*." *Id*. at ¶ 37.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  In doing so, courts must "accept as true all well-pleaded factual allegations in a complaint and view [those] allegations in the light most favorable to the [non-moving party]."  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  The allegations must "state a claim to relief that is plausible on its face."

*Id.* (quoting *Ridge at Red Hawk L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).  "The claim is plausible only if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Iqbal*, 556 U.S. 662, 678 (2009)).  The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The factual allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555—i.e., "that discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  A mere "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B. Qualified Immunity

"The qualified-immunity doctrine protects public employees from both liability and 'from the burdens of litigation' arising from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019), cert. denied sub nom. *Cummings v. Bussey*, —— U.S. ——, 140 S. Ct. 81, 205 L.Ed.2d 27 (2019) (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013)).  "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).  Doing so, however, "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (internal quotation marks omitted).  "At the motion to dismiss stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Id.* (brackets and internal quotation marks omitted) (emphasis in original).  The Court evaluates "(1) whether

the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (internal quotation marks omitted). The Court "may address the two prongs of the qualified-immunity analysis in either order: '[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense.'" *Cummings*, 913 F.3d at 1239, (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016), cert. denied, —– U.S. ——, 137 S.Ct. 2151 (2017)). "[T]he onus in on the plaintiff to demonstrate" the two prongs of the qualified immunity inquiry. *Cummings*, 913 F.3d at 1239.

## III.   ANALYSIS

### A.   Count II Fails to State a Claim Under Section 1983 Against Defendant Lucero-Ortega

#### *1. Parties' Arguments*

Defendants assert that the allegations supporting Count II fail to state a claim of supervisory liability against Defendant Lucero-Ortega because "[t]here is absolutely no allegation of any knowledge of, let alone participation or acquiescence in, the alleged sexual assaults . . . or of any sort of personal direction by" Defendant Lucero-Ortega. Mot. at 9. Defendants also argue that Plaintiff "fails to allege the subjective component" of the deliberate indifference test. *Id*.

Plaintiff responds that *Keith v. Koerner*, 707 F.3d 1185 (10th Cir. 2013), demonstrates that her allegations "are sufficient . . . to state a claim and defeat" qualified immunity. Resp. at 4. In Plaintiff's view, the following allegations state a claim of supervisory liability: (1) that video monitors captured Defendant Valdez entering her cell on five occasions in violation of WNMCF policy; (2) that Defendant Lucero-Ortega failed to implement policies and procedures to keep inmates safe from sexual assault; and (3) that there have been numerous recent allegations at the facility, including against Defendant Valdez. *Id*. (citing Compl. at ¶¶ 27–28, 30).

With respect to the requisite mental state, Plaintiff relies on *Wilson v. Montano*, 715 F.3d 847, 850 (10th Cir. 2013). *Id.* Here, Plaintiff argues that the Complaint sufficiently states a claim because she "has alleged that Defendant Lucero-Ortega acted with deliberate indifference toward the wellbeing and rights of the inmates of the facility and has alleged prior violations, and specific failures of monitoring." *Id.*

### 2. Supervisory Liability under Section 1983

"The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement—to include 'reasonable measures to guarantee the safety of the inmates.'" *Gray v. Ade*, 2020 WL 3121012, at *4 (10th Cir. June 12, 2020) (unpublished) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). This includes a duty to protect inmates from sexual assault. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." citing *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir.1986)).

An Eighth Amendment claim for failure to protect is comprised of two elements: (1) an inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm[,]" and (2) "the inmate must establish that the prison official has a sufficiently culpable state of mind, i.e., that he or she is deliberately indifferent to the inmate's health or safety." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996) (internal quotation marks and citations omitted). When, as here, a failure to protect claim is based on a theory of supervisory liability against an administrator of a correctional facility, in order to establish a constitutional violation, i.e., the first prong of the qualified immunity test, Plaintiff must demonstrate that Defendant Lucero-Ortega *personally* violated her constitutional rights. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (observing that § 1983 does not "authorize liability under a theory of *respondeat superior*"

6

(quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013))). Therefore, Plaintiff "must show an 'affirmative link' between [Defendant Lucero-Ortega] and the constitutional violation." *Schneider*, 717 F.3d at 767 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)). To "demonstrate such an affirmative link," Plaintiff must show "(1) personal involvement; (2) causation, and (3) state of mind." *Perry*, 892 F.3d at 1121 (citation omitted).

Thus, the allegations in the Complaint must make the following circumstances plausible: (1) Defendant Lucero-Ortega was "responsible for but 'failed to create and enforce policies to protect'" Plaintiff from the sexual assault, *id*. (quoting *Keith v. Koerner (Keith II)*, 843 F.3d 833, 840 (10th Cir. 2016)); (2) Defendant Lucero-Ortega "set in motion a series of events that [she] knew or reasonably should have known would cause [corrections officers] to deprive [Plaintiff] of [her] constitutional rights," *id*. (quoting *Keith II*, 843 F.3d at 847); and (3) Defendant Lucero-Ortega possessed the "requisite state of mind" and "acted with deliberate indifference." *Id*.

In turn, to sufficiently plead deliberate indifference, the Complaint must make it plausible (1) that Defendant Lucero-Ortega was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]; (2) that [s]he actually drew that inference; and (3) that [s]he was aware of and fail[ed] to take reasonable steps to alleviate that risk." *Perry*, 892 F.3d at 1122 (quoting *Keith II*, 843 F.3d at 848) (first and fourth brackets in original).

### 3.   *Plaintiff Fails to Sufficiently Allege Deliberate Indifference*

Defendants argue that the Complaint fails to allege that Defendant Lucero-Ortega acted with deliberate indifference. Mot. at 9. Plaintiff argues that *Keith* and *Wilson* demonstrate otherwise. Resp. at 4. The Court will discuss each in turn.

In *Keith*, a female inmate brought a § 1983 claim, alleging violations of her Eighth

Amendment rights by the warden (and other non-supervisory employees). 707 F.3d at 1187.  A male prison employee "engaged in unlawful sexual acts with [the plaintiff] in October of 2007, and she became pregnant as a result." *Id.*[4]  The plaintiff alleged that the "[d]efendants created and allowed a policy or culture of sexual misconduct at [the corrections facility] which placed her at substantial risk of harm, failed to take reasonable measures to abate the culture of sexual misconduct, and were deliberately indifferent to this substantial risk of harm." *Id.*  To support this allegation, the plaintiff "incorporated as part of her complaint a 2010 Kansas Legislative Post Audit Report ("Audit Report") that contained multiple findings regarding the situation at [the correctional facility] during and subsequent to her incarceration." *Id.*  In addition, the plaintiff "alleged facts indicating previous incidents of both sexual misconduct and undue familiarity, inconsistent disciplinary responses to such incidents, structural policy problems at TCF, and a lack of appropriate training programs." *Id.*  The defendants filed a motion to dismiss based in part on qualified immunity and the district court granted immunity to all defendants except the warden. *Id.*

The sole question on appeal was whether the plaintiff "alleged facts sufficient to support such a deliberate indifference violation by [the warden]." *Id.* at 1188.  Answering in the affirmative, the Tenth Circuit concluded that the "complaint refers to facts, primarily from the Audit Report, that could support a conclusion that [the warden] was aware of multiple incidents of unlawful sexual conduct at [the correctional facility]." *Id.* at 1189.  The court explained that the complaint "point[ed] to reports of at least 54 incidents of sexual misconduct and 33 incidents of undue familiarity between 2005 and 2009 and to a 2005 lawsuit over strip searches at [the

---

[4] To be clear, *Keith II* describes the circumstances leading to the plaintiff's pregnancy as forcible rape.  *Keith II*, 843 F.3d at 836.

correctional facility], suggesting that [the warden] may have had knowledge of these accounts." *Id*. The court further reasoned that the plaintiff stated a plausible claim of supervisory liability because the factual allegations "indicat[ed] that discipline in response to complaints of sexual misconduct and undue familiarity at [the correctional facility] was inconsistent . . . the Audit Report [] describes multiple failures to properly investigate allegations and to terminate employees when allegations were substantiated." Lastly, the plaintiff "allege[d] facts that tend to show the existence of structural policy problems that contributed to the unlawful sexual conduct here . . . the Audit Report which determined that policy decisions—particularly decisions not to address known problems with the vocational training program and the insufficient use of cameras to monitor inmates and staff—made TCF 'ripe for staff misconduct.'" *Id*.

In *Wilson*, the plaintiff "allege[d] he was unlawfully detained and deprived of his constitutional right to a prompt probable cause determination." 715 F.3d at 850. He was "arrested without a warrant" by a Valencia County Sheriff's Office deputy and transported to the Valencia County Detention Center. *Id*. Prior to booking the plaintiff into the detention center, the deputy "prepared a criminal complaint listing the charge against [the plaintiff] as a misdemeanor offense," however, no one at the Sheriff's Office "ever filed the criminal complaint in a court with jurisdiction or brought [the plaintiff] before a judicial officer for a probable cause determination" while he was being held in custody. *Id*. A magistrate judge eventually ordered the plaintiff's release eleven days after his arrest, noting that no complaint had ever been filed. *Id*. In response to the magistrate judge's order, a deputy "filed the misdemeanor criminal charge in an appropriate court" but "the district attorney's office dismissed the charge due to insufficient evidence." *Id*.

Among other things, the plaintiff alleged that the warden and sheriff "were liable for establishing an unconstitutional policy or custom and deliberate indifference." *Id*. at 851. Against

the warden, the plaintiff alleged that (1) "*prior to his detention*, there were *numerous incidents* in which [the detention center] held individuals without filing criminal charges or otherwise allowing them to appear before a magistrate judge;" (2) "his detention was the result of a policy established by [the warden] in which individuals were routinely held without the filing of criminal charges until they were released by *sua sponte* court orders;" (3) the warden "trained his staff to accept inmates without the filing of charges;" and (4) the warden "was deliberately indifferent to the unconstitutional policy of incarcerating citizens without pending charges." *Id.* (emphases added). Against the Sheriff, the plaintiff alleged that (1) "there were numerous *prior incidents* in which VCSO deputies arrested individuals without a warrant and thereafter failed to file criminal complaints or provide prompt probable cause determinations;" (2) "these illegal detentions, including his own, were the result of a policy or custom established by [the sheriff];" (3) the sheriff "failed to train his staff, which resulted in the routine incarceration of individuals without legal process;" and (4) the sheriff "was deliberately indifferent to the constitutional violations which resulted from his policies, customs, and/or failure to train his employees." *Id.* (emphasis added). The defendants filed a motion to dismiss based on qualified immunity and the district court denied that motion. *Id.*

The Tenth Circuit affirmed, concluding that the complaint "allege[d] [that] Warden Chavez acted with deliberate indifference to routine constitutional violations occurring at the [detention center]. This allegation is supported by [the plaintiff's] assertions that there were *numerous prior occasions* in which individuals at the [detention center] and [sheriff's office] were subject to prolonged warrantless detention." *Id.* at 858 (emphasis added). The court likewise determined the similar allegations against the sheriff sustained a claim of supervisory liability. *Id.*

Turning to the allegations in the Complaint, the Court concludes that neither *Keith* nor

*Wilson* supports Plaintiff's position.  To begin, the Court believes that Plaintiff is arguing facts that the Complaint does not allege.  *See County of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1035 (10th Cir. 2002) ("In deciding a Rule 12(b)(6) motion, a federal court may only consider facts alleged within the complaint.").  Plaintiff contends that she has alleged "prior violations" and "specific failures of monitoring" such that *Keith* and *Wilson* dictate the outcome. Resp. at 4.  But Plaintiff's Complaint merely alleges that Defendant Valdez violated policy by entering Plaintiff's cell five times over the course of a week and that "there have been *numerous recent accusations* . . . including other allegations against Defendant Valdez." *See* Compl. at ¶¶ 11–17, 30 (emphasis added).  Even in the light most favorable to Plaintiff, these allegations do not translate into fact assertions that make it plausible that Defendant Lucero-Ortega had knowledge of misconduct that *preceded* Defendant Valdez's sexual assault.  And prior accusations are necessary to establish deliberate indifference based on the facts of this case.  To illustrate, in *Keith* the court found that *numerous allegations and a lawsuit preceded* the incident in question and that *the attached audit report detailed* the warden's failure to properly investigate those accusations and terminate employees when allegations were substantiated.  707 F.3d at 1189.  Similarly, in *Wilson* the court found facts sufficient to establish deliberate indifference because "there were *numerous prior occasions* in which individuals . . . were subject to prolonged warrantless detention."  715 F.3d at 858.  Here, the Complaint is silent on prior instances of sexual assault committed by corrections officers against inmates.  Without Defendant Lucero-Ortega allegedly having knowledge that correctional officers posed an unreasonable risk to inmates, it is not plausible that Defendant Lucero-Ortega acted with deliberate indifference for failing to implement policies and procedures concerning screening, training, and monitoring.

This reasoning similarly applies to Plaintiffs argument that "the events were videotaped"

11

but "apparently no one paid attention to it."  Resp. at 4.  Plaintiff's Complaint again fails to allege prior instances of policy violations—here failing to monitor prison security cameras—which led to sexual assaults on inmates such that it is plausible that Defendant Lucero-Ortega acted with deliberate indifference.  While it is true that Defendant Valdez entered Plaintiff's cell five times, this occurred over the course of a single week and included the same victim.  Also, WNMCF staff was unaware of Defendant Valdez's conduct because Plaintiff did not report the assaults.  To state the obvious, there is no allegation that Defendant Lucero-Ortega knew that correctional officers were entering inmate cells or that a prior lapse in video monitoring by WNMCF employees led to a sexual assault by a corrections officer against an inmate.  Merely alleging that "no one apparently monitors the video as Defendant Valdez can be seen entering Plaintiff's cell on numerous occasions in violation of WNMCF policy"—without factual (and non-conclusory) allegations of prior instances—falls short of adequately pleading the mental state required to support a supervisory liability claim under § 1983.  The Court will dismiss Count II.

### B.  Count III Fails to State a Claim under the New Mexico Tort Claims Act

Count III is entitled "Tort Claim Against All Defendants" and is brought under New Mexico law, which generally requires a waiver of immunity under the New Mexico Tort Claims Act ("NMTCA") to hold public officials liable.  Plaintiff does not allege, however, that a specific waiver provision under the NMTCA applies to "all Defendants."  Rather, Plaintiff alleges only that "Defendant Department's immunity from suit has been waived" under N.M. Stat. Ann. § 41-4-6.  *See* Compl. at ¶ 38.  By explicitly directing the waiver only to Defendant NMDC, Plaintiff has failed to give Defendant Lucero-Ortega notice in violation of Federal Rule of Civil Procedure 8(a)(2).  *See Twombly*, 550 U.S. at 555 (Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice

of what the . . . claim is and the grounds upon which it rests'" (citation omitted)).  In addition, as discussed below, this creates problems with Plaintiff's vicarious liability theory, which requires a waiver of immunity on behalf of an individual capacity defendant in order to impute liability onto a government entity.  *See Silva v. State*, 745 P.2d 380 (N.M. 1987).  Nevertheless, the Court will address Plaintiff's tort claim as applied to Defendant Lucero-Ortega (and Defendant Valdez under her vicarious liability theory) in the alternative.

In the Court's discretion, it will first address the waiver that Plaintiff explicitly asserts against Defendant NMDC before discussing vicarious liability and other potential waivers of immunity under the NMTCA.

   *1.  New Mexico Tort Claims Act Section 41-4-6*

     *a)  Parties' Arguments*

Defendants' attack on Plaintiff's state law claim is as follows: "[T]he New Mexico Supreme Court squarely has held that § 41-4-6 NMSA 1978 does <u>not</u> waive immunity where the negligence at issue involves an 'administrative function associated with the operation of the corrections system' or for acts or omissions involving the 'security, custody, and classification' of inmates."  Mot. at 10 (emphasis in original) (quoting *Archibeque v. Moya*, 866 P.2d 344, 347 (N.M. 1993)).  Defendants maintain that this "principle goes back at least thirty years, and has never been questioned."  *Id.* at 11 (citing cases).

For her part, Plaintiff argues that the waiver of immunity extends beyond mere "operation and maintenance of the physical aspects of the building and includes safety policies necessary to protect the people who use the building."  Resp. at 5 (quoting *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259 (N.M. 2006)).  Specifically, Plaintiff asserts that the fact allegations in the Complaint demonstrate "a failure regarding security practices that rendered the facility unsafe for all of its

intended users as opposed to alleging that there was a discrete administrative failure putting a single person at risk." *Id.*

 b) *Plaintiff Fails to Plead a Waiver of Sovereign Immunity Under New Mexico Tort Claims Act Section 41-4-6*

 "The NMTCA preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived." *Fernandez v. Mora-San Miguel Elec. Co-op., Inc.*, 462 F.3d 1244, 1250 (10th Cir. 2006) (citing N.M. Stat. Ann. § 41-4-4). Relevant here, N.M. Stat. Ann. § 41-4-6 waives immunity for "damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6. For the waiver to apply, the negligent "operation or maintenance" must create a dangerous condition that threatens the general public or a class of users of the building. *Upton*, 141 P.3d at 1261. A single discrete administrative decision affecting only one person does not fall within the Section 41-4-6 waiver. *Id.* at 1264. In the prison context, "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not include the security, custody, and classification of inmates . . . Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." *Archibeque*, 866 P.2d at 347 (citations omitted).

 Plaintiff believes that the following allegations bring Count III within § 41-4-6's waiver: (1) video cameras recorded Defendant Valdez entering Plaintiff's cell five times over the course of a week, (2) Defendant Valdez violated WNMCF policy by entering Plaintiff's cell, and (3) there have been numerous recent complaints of sexual assault at WNMCF. *See* Resp. at 8. Both Plaintiff and Defendants proffer several cases for this waiver inquiry. The Court will therefore examine

whether Plaintiff's claim fits within the class of claims for which New Mexico courts have found waiver under § 41-4-6.

To begin, the Supreme Court of New Mexico clarified § 41-4-6 in the prison context via a certified question from the Tenth Circuit Court of Appeals.  The question was as follows:

> Does [NMSA 1978, Section 41–4–6 (Repl.Pamp.1989) ] of the New Mexico Tort Claims Act, [NMSA 1978, Sections 41–4–1 to –29 (Repl.Pamp.1989 & Cum.Supp.1993) ], provide immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?

*Archibeque*, 866 P.2d at 346 (brackets in original).  In *Archibeque,* the plaintiff, Archibeque, was transferred from the Central New Mexico Correctional Facility to the New Mexico State Penitentiary in Santa Fe, New Mexico.  *Id*. at 346.  Before being released into the prison's general population, Archibeque met with a prison intake officer, Moya-Martinez, to discuss whether the defendant had any known enemies.  *Id.*  Archibeque informed Moya-Martinez that another inmate at the facility, Gallegos, was one of his enemies.  *Id*.  Without checking the inmate roster to see if Gallegos was listed as a current resident of the facility, Moya-Martinez assured Archibeque that Gallegos was no longer incarcerated at the prison.  *Id*.  Archibeque was then released into general population and assaulted by Gallegos.  *Id*.

Archibeque brought suit alleging that "Moya–Martinez was participating in the operation of the penitentiary when she classified [him] as an inmate that could safely be released into the general prison population" and this "alleged negligence in misclassifying Archibeque and releasing him into the general population constituted negligent operation of the penitentiary and was effective to waive immunity under Section 41–4–6."  *Id*. at 346–47.  The Supreme Court of New Mexico rejected this argument, concluding that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in Section 41–4–6, does not include the security,

custody, and classification of inmates." *Id*. at 347.  The court explained that Moya-Martinez "was performing an administrative function associated with the operation of the corrections system. Section 41–4–6 does not waive immunity when public employees negligently perform such administrative functions." *Id*.  Importantly, the court noted that "Moya–Martinez's misclassification of Archibeque [only] put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population." *Id*.

Next, in *Callaway v. New Mexico Dep't of Corr.*, 875 P.2d 393, 394 (N.M. Ct. App. 1994), the New Mexico Court of Appeals reviewed § 41-4-6 in the prison context.  There, the plaintiff, Callaway, alleged the following facts: (1) within hours of being transferred to the penitentiary in Santa Fe, "he was severely beaten about the head by at least three other inmates in the F–2 recreation area at the main facility," (2) the attackers "were known gang members with a prior history of violence against other inmates," (3) the "structural design and layout of the recreation room added to the danger of the situation in that the room has blind corners, a stair well, and other areas which are shielded from direct observation by the recreation officers," (4) "potential weapons such as weight bars and pool cues are located in the recreation area," and (5) "[o]nly two recreation officers were assigned to the entire recreation room and responsible for maintaining security and ensuring the safety of the inmates." *Id*. at 395.  Callaway argued that the defendants "were negligent in letting the gang members loose among new orientees in such a potentially dangerous area as the recreation room, which was shielded from the corrections officers' direct observation due to the blind corners and stair well and which contained potential weapons such as weight bars and pool cues." *Id*. at 395.  Callaway also "allege[d] that the gang members had committed prior acts of violence against other inmates and that despite Defendants' knowledge of the gang

members' known propensity for violence, Defendants failed to take any action to protect Plaintiff and other inmates in the prison." *Id*. at 397–98.

Relying on *Archibeque*, the New Mexico Court of Appeals concluded that Callaway had "stated a claim sufficient to waive immunity under Section 41–4–6," because the New Mexico Corrections Department "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." *Id.* at 399.

In *Espinoza v. Town of Taos*, 905 P.2d 718 (N.M. 1995), the Supreme Court of New Mexico addressed § 41-4-6 in a day-care setting.  The plaintiff, Espinoza, enrolled her two children in the Town of Taos's summer day camp program.  *Id*. at 719.  Ms. Espinoza was assured that "six camp employees would supervise the children, that the program director would be available for direct supervision, and that the on-site supervisor, Sally Martinez, would physically be present with [one of the plaintiff's children] to ensure his safety."  *Id.*  In addition, "[t]he operation of the program called for an active on-site supervisor and three additional employees when the activities of the program were held at Kit Carson State Park."  *Id.*

In early August when "summer day camp had ended for the day and the children were gathered at the playground waiting for their parents to pick them up," Ms. Espinoza's son "followed other children up a slide rather than using the steps and was injured when he fell from the top as he attempted to turn around."  *Id*.  At the time the child was "injured, neither [the] on-site supervisor [] nor any other person performing her function was present. Furthermore, there were only two employees with the children at the park."  *Id.*

17

The state district court entered summary judgment in favor of the Town of Taos finding that "Section 41–4–6 of the Tort Claims Act does not waive sovereign immunity for the Town of Taos's failure to exercise ordinary care in the supervision of children who participated in its summer day camp program." *Id.* at 721. In doing so, the "court rejected [Ms. Espinoza's] contention that the absence of adequate supervision was a dangerous 'condition' of the playground for which sovereign immunity had been waived." *Id.*

The Supreme Court of New Mexico affirmed, finding no waiver of sovereign immunity for negligent supervision of children at a playground. It reasoned that "[a]ll cases cited by [Ms. Espinoza] [which included *Archibeque* and *Callaway*] concern[ed] negligent conduct that itself created unsafe conditions for the general public. In the case at bar, the negligent conduct itself did not create the unsafe conditions." *Id.* at 722. The court continued:

> [t]he playground was a safe area for children. There were no gangs threatening the children, no free-roaming dogs, no influx of traffic, no improperly maintained equipment. The playground is distinct from, for example, the swimming pool at issue in [*Seal v. Carlsbad Independent School District*, 860 P.2d 743 (1993)]. There, the unsafe condition of the premises was a swimming pool without the superintending lifeguard protection required by statute. Here, the playground itself, particularly the slide, was not a condition requiring supervision. Rather, it was the day-camp undertaking and not the condition of the premises that gave rise to duty.

*Id.*

More recently, the Supreme Court of New Mexico revisited § 41-4-6 in *Upton v. Clovis Mun. Sch. Dist.,* 141 P.3d 1259 (N.M. 2006), as revised (Sept. 12, 2006). There, the Upton's fourteen-year-old daughter died from asthma attack that occurred while she was at school. *Id.* at 1260. The Uptons claimed that school personnel acted negligently, causing the death of their daughter, Sarah, and that such negligence was actionable under § 41–4–6. *Id.* The state district court granted summary judgment for the school, and the New Mexico Court of Appeals affirmed. *Id.*

Before Sarah's death, the Uptons took precautions to combat her asthma, which included talking with the school's physical education teacher so that Sarah could limit her participation if she felt that the physical exercise would trigger an attack. *Id.* The Uptons also "noted her condition on her Individualized Education Plan (IEP), an agreement between parents of children with special needs and educators specifying certain educational goals and the special services their child would require" and "gave their consent so that school personnel could immediately contact medical personnel directly in the event of an attack." *Id.*

On the date of Sarah's death, a substitute teacher oversaw her physical education class. *Id.* During that class Sarah began having breathing difficulties and asked the substitute teacher for permission to stop, but the substitute teacher refused. *Id.* Sarah collapsed in her next class. *Id.* A teacher called the front office for assistance and also attempted to administer two inhaler treatments. *Id.* When assistance arrived, they checked Sarah's vitals and notified the front office to call 911. *Id.* Sarah was then placed in a wheelchair and taken into the hallway, no one administered CPR or any other emergency protocol. *Id.* Approximately fifteen minutes later, a police officer saw Sarah in the hallway and called 911. *Id.* The School also called 911 around this time. *Id.* Sarah died before medical personnel arrived. *Id.*

Based on these facts, the Supreme Court of New Mexico determined that § 41–4–6 applied. The court reasoned that the plaintiffs had asserted more than negligent supervision and had challenged the school district's general failure to implement safety policies for at-risk students. *Id.* at 1263. Specifically, the school's failure to follow the procedures established for at-risk students put all similarly situated students at risk, thus creating a dangerous condition on the premises. *Id.* at 1265 ("The school's indifference towards Sarah's special medical needs makes it more likely that all similarly situated students were at risk as well . . . The school's failures, if

proven, created a dangerous condition for all special-needs children, and with regard to emergency responsiveness, for every student at the school.").

Lastly, the parties rely on *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611 (N.M. 2013). In *Encinias*, the New Mexico Supreme Court determined that there was a genuine issue of material fact as to whether a dangerous condition existed on school premises, such that immunity was waived. *Id*. at 619.  There, the plaintiff was badly beaten by a classmate on a street that the high school had cordoned off for use by food vendors. *Id*. at 614.  The assistant principal made a statement describing this area as a "hot zone" for student violence, which the court considered enough to "raise questions about the degree of student violence and the school's efforts to discover and prevent student violence in that area." *Id*. at 619. The court reasoned that "[w]hile one student's battery of another would not generally waive a school's immunity under Section 41-4-6(A), a school's failure to address a pattern of student violence in a particular area might create an unsafe condition on the premises." *Id*. at 618.

In this case, Plaintiff argues that Defendant Lucero-Ortega subjected the inmates of WNMCF to a dangerous condition when she failed to institute policies concerning screening, training, and monitoring to keep the prisoners safe from sexual assault by staff.  Resp. at 7.  In support of this proposition, Plaintiff alleges that Defendant Valdez was recorded entering her cell, that "no one apparently monitors the video," and that there have been recent reports of sexual assaults at the prison. *Id*.  According to Plaintiff, this case concerns the safety of a class of persons and not a single individual. *Id*. at 11.  Thus, Plaintiff believes this case parallels *Callaway* and *Upton* and is dissimilar to *Archibeque* and *Espinoza*. *Id*.  Defendants argue that *Archibeque* and *Espinoza* demonstrate that Plaintiff's allegations amount to "nothing more than administrative functions associated with the operation of the prison, negligent supervision, and negligence related

to the security, custody, and classifications of inmates." Mot. at 13 (internal quotations and citation omitted).

At the outset, the Court will disregard Plaintiff's conclusory allegation that there have been *recent accusations* of sexual assault. In addition to being conclusory, this assertion is irrelevant to the issue of whether Defendants created a dangerous condition that led to the assault on Plaintiff, which requires allegations of *prior instances* of misconduct. Without Plaintiff's allegation of recent assaults, she is left with the following: (1) Video cameras recorded Defendant Valdez entering Plaintiff's cell in violation of WNMCF policy five times in seven days and (2) no one monitors the security cameras.

Plaintiff cannot establish that a dangerous condition existed at WNMCF that placed a particular class of persons at risk. In *Upton*, the school's conduct went beyond negligent supervision because: (1) the "school ignored the information it was given by the Uptons;" (2) the school failed to warn the substitute teacher about the student's condition; and (3) the "school failed to follow through with the proper emergency procedures." 141 P.3d at 1264. "These actions and omissions *combined to create* the dangerous conditions, placing Sarah in a far worse position than reasonable and expected risks of [school] life." *Id.* (emphasis added). Here, Plaintiff does not allege that any corrections officer (or individually named Defendants) had information that Plaintiff (or any other inmate) was at an increased risk of sexual assault, ignored that risk, and then failed to respond after the assault occurred. Indeed, Plaintiff did not report any interaction with Defendant Valdez to his supervisors or other staff that would impute knowledge of a specialized risk; Plaintiff only alleged recent accusations of sexual assault. Nor does Plaintiff allege a failure to respond in violation of WNMCF policy.

*Callaway* and *Encinias* also reinforce the need for some sort of notice (actual or constructive) prior to the underlying incident to state a plausible failure to supervise claim under § 41–4–6.[5]  In *Callaway*, the defendants "knew or should have known that *roaming gang members* with a *known propensity for violence* against other inmates had *access to potential weapons* in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable."  *Callaway*, 875 P.2d at 399 (emphasis added).  Similarly, in *Encinias* the plaintiff established an inference of knowledge through a statement made by the assistant principal that described an area as a "hot zone" for student violence.  310 P.3d at 619.  This statement was enough to "raise questions about the degree of student violence and the school's efforts to discover and prevent student violence in that area."  *Id.* at 619.  Here, Plaintiff only alleges *recent* accusations of misconduct and not *prior instances* of sexual assault committed by corrections officers such that Defendants knew or should have known that inmates were at an increased risk.  *See Castillo v. Santa Fe Cty.*, 755 P.2d 48, 50 (N.M. 1988) ("Under the allegations of her complaint, it appears that Castillo could prove that the Housing Authority was aware or should have been aware of the continuing problem").  Unlike roaming prison gangs with a *known* propensity for violence or allowing students to congregate in a *known* hot spot, a correctional officer working at a prison without prior instances of sexual assault

---

[5] *See Lucero v. Olivas*, 2016 WL 10179281, at *6 (D.N.M. Sept. 13, 2016) ("Accordingly, in order to determine whether Plaintiffs have stated a plausible claim [under § 41-4-6], the Court must answer the following questions: (1) whether Plaintiffs allege that Defendants knew or should have known about the dangerous conditions . . . and (2) whether the dangerous condition was foreseeable."); *Rall v. Hobbs Mun. Sch. Dist.*, 2016 WL 10588125, at *16 (D.N.M. Mar. 16, 2016) (School district failed to follow established policies and procedures, received notice that an unscreened staff member was taking a student off campus against the parents' wishes, and did nothing to intervene.); *see also Herrera v. Quality Pontiac*, 73 P.3d 181, 186 (N.M. 2003) (intentional tort of third party did not relieve negligent defendant of liability because defendant knew or should have known negligent actions would lead to criminal activity).

or policy violations does not present a foreseeable risk to inmates.  Furthermore, sexual assaults

that occur over a very short period do not create an unsafe condition at the prison.  *See Encinias*,

310 P.3d at 618 ("[w]hile one student's battery of another would not generally waive a school's

immunity under Section 41-4-6(A), a school's failure to address a pattern of student violence in a

particular area might create an unsafe condition on the premises.").

In addition, the simple failure to continuously monitor the video screens, without known

instances of prior assaults or staff misconduct, cannot create a dangerous condition.  *See Upton*,

141 P.3d at 1264 ("These actions and omissions *combined to create* the dangerous conditions"

(emphasis added)).  Here, the risk of sexual assault arose not because WNMCF staff failed to see

Defendant Valdez enter Plaintiff's cell on the monitors but rather from Defendant Valdez himself.

*See Archibeque*, 866 P.2d at 350 (Ransom, C.J., concurring) ("The risk arose not from a condition

of the premises (as with the wild dogs in Castillo or, arguably, the inadequate health care facilities

in *Silva* [*v. State*, 745 P.2d 380]); it arose from the classification itself.").[6]  Indeed, the only

allegations of sexual assault that occurred during the relevant period—as opposed to Plaintiff's

allegation that there have been recent accusations against corrections officers—are against

Defendant Valdez.  *See Upton*, 141 P.3d at 1264 ("If the only alleged misconduct toward Sarah

had been the substitute P.E. teacher failing to watch her while she participated in physical exercise,

the Upton's claim . . . would be practically identical to the single claim of negligent supervision

we found inadequate in *Espinoza*.").  Thus, it appears that WNMCF's alleged negligence *during*

---

[6] Several courts have relied on Chief Justice Ransom's special concurrence in *Archibeque* for guidance.  *See, e.g., Prince v. City of Deming,* 2020 WL 1821259, at *24 (D.N.M. Apr. 10, 2020); *Williams v. Bd. of Regents of Univ. of New Mexico*, 20 F. Supp. 3d 1177, 1189 (D.N.M. 2014); *Candelaria v. Montoya,* 2010 WL 11623493, at *10 (D.N.M. Mar. 18, 2010); *see also Callaway*, P.2d at 399 ("Chief Justice Ransom in his special concurrence elaborated on the significance between a 'discrete administrative decision' which does not waive immunity and 'a general condition of unreasonable risk from negligent security practices' which could waive immunity.").

*the relevant period* put only Plaintiff at risk of harm and "did not create an unsafe condition on the prison premises as to the general prison population." *Archibeque*, 866 P.2d at 347. Consequently, the failure to prevent Defendant Valdez from entering Plaintiff's cell over the course of a single week amounted to negligent supervision standing alone and not from the negligent operation and maintenance of the prison. Plaintiff has failed to plausibly plead a waiver of immunity under § 41–4–6.

### 2. *Vicarious liability and § 41-4-12*

In addition to alleging liability under § 41-4-6, Plaintiff alleges that "Defendant Department is responsible for the negligence of its employees under the doctrine of *respondeat superior*." Compl. at ¶ 37. Under New Mexico law, a governmental entity remains vicariously liable "for any tort of its employee acting within the scope of duties for which immunity is waived." *Silva*, 745 P.2d at 380. To name a particular entity in an action under the NMTCA requires two things: a liable public employee "who meets one of the [NMTCA] waiver exceptions [ ]; and [ ] an entity that has immediate supervisory responsibilities over the employee." *Id.* If a public employee meets an exception to immunity, then the supervising entity, including the state, can be named as a defendant in an action under the NMTCA. *See id.*

For the reasons discussed above, § 41-4-6 cannot be used as the requisite waiver of immunity for the individually named Defendants, therefore the allegations in the Complaint must make it plausible that another section applies for Plaintiff to proceed under this vicarious liability theory. But Plaintiff neither alleges in the Complaint nor argues in Response to the Motion that another provision applies. Plaintiff merely states that "[a]bsent a discussion of Defendant Valdez' liability for his actions under the Act, Defendant [NMDC] is vicariously liable." Resp. at 9. Defendants counter, however, that no other waiver covers the allegations in the Complaint.

Specifically, Defendants argue that the only other relevant waiver based on these facts, § 41-4-12, is inapplicable because the individually named Defendants are not "law enforcement officers" as contemplated by the NMTCA.  Reply at 9-12.  The Court agrees.

The NMTCA waives immunity for intentional torts such as assault, battery, false imprisonment, and deprivation of constitutional rights only when they are committed by law enforcement officers acting within the scope of their duties.  NMSA 1978 § 41-4-12.  To claim an intentional tort against a public employee, "a plaintiff must demonstrate that the defendant [was a] law enforcement officer[] acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in [the NMTCA] or a deprivation of a right secured by law." *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 916 P.2d 1313 (N.M. 1996).

New Mexico courts do not consider prison guards and other state corrections officers to be "law enforcement officers" under the NMTCA.  *See Callaway*, 875 P.2d at 393.  The *Callaway* court found that the principal duties of prison guards are "to hold in custody persons who have already been convicted rather than merely accused of a criminal offense[.]"  *Id*.  "[M]aintenance of public order relates to a public not a penitentiary setting, and although prison guards may have the supplemental power to arrest [under certain circumstances] . . . their principal statutory duties are those set forth in Section 33-2-15."  *Id*.  Likewise, New Mexico courts do not consider wardens law enforcement officers.  *See Anchondo v. Corr. Dep't*, 666 P.2d 1255, 1258 (N.M. 1983) ("[T]here is no reason to equate the positions of Secretary of Corrections or Warden with the position of 'law enforcement officer,' as that term is used in the Tort Claims Act.").  Because Defendant Valdez, as a corrections officer, and Defendant Lucero-Ortega, as the warden, are not "law enforcement officers," the NMDC remains immune and cannot be vicariously liable under the NMTCA for intentional torts committed by them.

## IV.    CONCLUSION

Plaintiff has failed to state a plausible § 1983 claim against Defendant Lucero-Ortega. Plaintiff has also failed to allege sufficient facts that establish Defendants waived immunity under the New Mexico Tort Claims Act.

IT IS THEREFORE ORDERED THAT:

(1) Defendants'   MOTION   TO   DISMISS   COMPLAINT   BASED   IN   PART   ON QUALIFIED IMMUNITY (Doc. 3) is GRANTED;

(2) Count II of Plaintiffs' Complaint (Doc. 1-1) brought against Defendant Lucero-Ortega is DISMISSED WITH PREJUDICE; and

(3) Count III of Plaintiffs' Complaint brought against Defendants Lucero-Ortega and New Mexico Department of Corrections is DISMISSED WITH PREJUDICE.

_____

SENIOR UNITED STATES DISTRICT JUDGE